United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS, et al.,<br><br>Defendants. | Case No. 16-cv-05420-RS<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I. INTRODUCTION

This is an APA action challenging certain plans the U.S. Army Corps of Engineers has made regarding how and when it will periodically dredge two specific shipping channels in the San Francisco Bay to keep them navigable by large ships. Plaintiff is an agency of the State of California—the San Francisco Bay Conservation and Development Commission ("BCDC").[1]

Environmental regulation of the Bay implicates a host of federal and state agencies,

---

[1] A private environmental group, San Francisco Baykeeper, was permitted to intervene as an additional plaintiff and has joined with BCDC in the present motions.

laws, and regulations. Further complicating matters, in many instances federal law delegates various policy making and enforcement powers to the state, such that state regulations then effectively have the force of federal law and cannot be overridden by a federal agency's rules.

The parties have brought cross-motions for summary judgment. Navigating through the river of applicable laws and rules, the end of the passage finds defendants entitled to summary judgment because BCDC cannot show the Corps has any obligation to dredge both the channels in dispute on an annual basis.

## II. FACTUAL OVERVIEW

The Corps conducts maintenance dredging of eleven federal navigation channels in and into the Bay. Six of these channels are deep draft (*i.e.*, greater than 15 feet deep), to allow access for oil tankers and other deep draft vessels. Historically, the Corps dredged all of the channels annually, except for Redwood City Harbor, which it dredges every one to two years. The current dispute relates to the Richmond Outer Harbor and to the Pinole Shoal Channel.

Dredging involves removing accumulated sediment from the channels. The Corps uses two different types of dredges in the Bay: hydraulic or "hopper" dredges and mechanical or "clamshell" dredges. Hopper dredges use suction pumps to draw sediment and water into a "draghead" that is pulled over the bottom of a channel. Clamshell dredges use buckets that scoop material from the channel bed. There is no dispute that use of hopper dredges negatively impacts fish populations. There also is no question, however, that hopper dredges work much faster, and therefore are more economical to use. BCDC insists clamshell dredges ordinarily do not hurt fish. The Corps contends the degree to which clamshell dredges are less harmful to fish than hopper dredges is an open question.

Dredged sediment is transported to and deposited at three different types of sites: 1) ocean disposal sites; 2) in-Bay disposal sites; and 3) beneficial reuse sites, where the

material is used for projects such as wetland restoration, beach nourishment, and levee maintenance. Currently, three ocean disposal sites exist for Bay sediment. The largest—the San Francisco Deep Ocean Disposal Site—is located 55 miles west of the Golden Gate. There are four in-Bay sediment disposal sites, and several beneficial reuse placement sites that are approved to accept dredged sediment or are in the process of being approved.

The parties agree that the Richmond Outer Harbor and Pinole Shoal Channel should be dredged—this is not a case where state environmental interests are opposed to Corps activity. Indeed, BCDC's position is that the Richmond Outer Harbor and the Pinole Shoal Channel should be dredged *annually*—that is, twice as often as the Corps has decided it will dredge the channels. The dispute arose because California state agencies sought to impose certain conditions on the dredging—primarily that hopper dredges be used in no more than one of the two channels—and the Corps contends it cannot afford to comply with the conditions if it dredges every year.

In essence, when the state agencies imposed conditions BCDC envisioned the Corps would continue to dredge both channels each year—one with a hopper dredge, and the other with a clamshell dredge, presumably alternating which channel got which type of dredge each year. The Corps responded by electing to provide an identical reduction in hopper dredge use—only one channel will be hopper-dredged each year—but eliminating clamshell dredging of the other channel. A more detailed chronology of the dispute is set out below.

### III. REGULATORY FRAMEWORK

It is undisputed that the Corps has the duty and authority to maintain the federal navigational channels in the Bay, including Richmond Outer Harbor and the Pinole Shoal Channel. Congress has delegated to the State, however, responsibility for protecting coastal resources and water quality under the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq.*, ("CZMA") and the Clean Water Act, 33 U.S.C. §§ 1251 *et seq*. ("CWA").

BCDC is the state agency designated under the CZMA for the Bay. Similarly, the San Francisco Bay Regional Water Quality Control Board ("The Regional Board") is designated to enforce the CWA.

The CZMA encourages each coastal state to develop a Coastal Zone Management Plan ("CZMP"), which is then submitted to the Office of Coastal Management ("OCM") within the National Ocean and Atmospheric Administration for approval. Thus, the CZMA "effect[s] a federal-state partnership to ensure water quality and coastal management around the country, so that state standards approved by the federal government *become the federal standard* for that state." *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 143-44 (2nd Cir. 2008) (emphasis added & citation omitted).

Once OCM approves a CZMP, the state obtains delegated federal authority to review and approve any federal agency activity within or outside the state coastal zone "that affects any land or water use or natural resource of the coastal zone." 16 U.S.C. § 1456(c)(1)(A). The CZMA requires that all such federal agency activities "be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies" of the state's approved CZMP. *Id*.; 15 C.F.R. §§ 930.30, 930.39(c). The CZMA requires each federal agency that proposes to carry out an activity that may affect any land or water use or natural resource in the coastal zone to provide a "consistency determination" to the designated state coastal zone management agency (here, BCDC) at least ninety days prior to the federal agency's final approval of the activity. 16 U.S.C. § 1456(c)(1)(C); 15 C.F.R. § 930.36(b)(1).

The consistency determination must explain whether and how the proposed federal activity is "consistent to the maximum extent practicable" with the "enforceable policies" of the federally-approved state CZMP. 15 C.F.R. §§ 930.36(a), 930.39(a), (c). "Consistent to the maximum extent practicable" means "*fully consistent* with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." *Id*. § 930.32(a)(1) (emphasis added).

The state may then concur, conditionally concur, or object to the federal agency's consistency determination. *Id*. § 930.41(a). If the federal agency does not agree with any conditions imposed by the state, then the federal agency may not proceed with the action unless it finds that: (1) its proposed action is fully consistent with the state CZMP notwithstanding the state's objections; or (2) consistency with the enforceable policies of the state's CZMP is legally prohibited and the federal agency has "clearly described, in writing, to the State agency the legal impediments to full consistency." *Id*. § 930.43(d).

The CWA works in a similar fashion. It requires each state to prepare Water Quality Standards that "protect the public health or welfare, enhance the quality of water and serve the purposes of the [CWA]." 33 U.S.C. § 1313(c)(2)(A). The EPA then reviews the state Water Quality Standards and determines whether they meet the CWA's requirements. 33 U.S.C. § 1313(c)(3). Once approved by the EPA, the State's Water Quality Standards are federally-enforceable standards under the CWA. *Id*.

Section 401 of the CWA gives states authority to ensure that activities in navigable waters in the state meet federally-approved state standards. See 33 U.S.C. § 1341. Whenever an entity applies for a federal license or permit for an activity that "may result in any discharge into navigable waters," that applicant must first obtain a water quality certification ("WQC") from the applicable state agency (here, the Regional Board) that the applicant's activity will not violate the standards. *Id*. § 1341(a)(1). If necessary, the WQC must include "limitations" to ensure the activity meets the requirements of the CWA and "any other appropriate requirement of State law." *Id*. § 1341(d); see also 40 C.F.R. § 121.2(a)(4) (authorizing the state to include "any conditions which the [state] deems necessary or desirable with respect to the discharge of the activity").

The Corps' maintenance dredging operations are subject to the CWA, including section 401. 33 U.S.C. §§ 1344(t),1323. The CWA expressly mandates that federal agencies "engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants . . . comply with, all Federal, State, interstate, and local requirements,

administrative authority, and process and sanctions respecting the control and abatement of water pollution." *Id*. § 1323(a).

Additionally, CWA section 404 requires a person to obtain a permit from the Corps for any discharge of dredged sediment into navigable waters. 33 U.S.C. § 1344(a), (d). Pursuant to section 404(b)(1), the EPA has adopted criteria for CWA section 404 permits to protect aquatic fish, wildlife, and ecosystems and ensure compliance with state Water Quality Standards. See generally 40 C.F.R. Part 230 (404(b)(1) Guidelines); 40 C.F.R. §§ 230.10(b), (c), 230.12(a)(3). When the Corps is the discharger, it does not need to obtain a section 404 permit from itself; however, the Corps is required to comply with "all applicable substantive legal requirements, including . . . application of the section 404(b)(1) guidelines." 33 C.F.R. § 336.1(a).

Finally, the Corps has adopted regulations governing its maintenance dredging operations, which require it to comply with the CZMA, CWA, and other environmental laws. *See generally* 33 C.F.R. Parts 335-338 (CDR); *see also* 33 C.F.R. §§ 335.2, 335.5(a), 335.6(h), 336.1(a), 336.1(b)(4). The Corps' regulations set forth its policy:

> [T]o regulate the discharge of dredged material from its projects to assure that dredged material disposal occurs in the least costly, environmentally acceptable manner, consistent with engineering requirements established for the project . . . *[t]he least costly alternative*, consistent with sound engineering practices and selected through the 404(b)(1) guidelines or ocean disposal criteria, *will be designated the Federal standard for the proposed project*.

*Id*. § 336.1(c)(1) (emphases added); *see also id*. § 335.4 (dredging will be done "in the least costly manner . . . consistent with engineering and environmental requirements"). The Corps refers to this as the "Federal Standard" dredging alternative. *See id*. § 335.7 (definition of the "Federal Standard").

## IV. CHRONOLOGY

In 1969 BCDC prepared, and the California Legislature adopted, the San Francisco Bay Plan. In 1977, the Bay Plan was approved in its entirety by OCM as part of California's CZMP. Similarly, the EPA has approved the Water Quality Standards promulgated by the Regional Board as part of the "Water Quality Control Plan for the San Francisco Bay Basin."

In 2001, the Corps, EPA, BCDC, the Regional Board, and the State Water Resources Control Board collectively adopted the Long-Term Management Strategy for the Placement of Dredged Material in the San Francisco Bay Region ("the LTMS"). The primary intent was to move away from the historical practice of dumping approximately 80% of dredged material back into the Bay itself. The LTMS identified four overarching objectives: (1) to maintain navigation channels in an economically and environmentally sound manner and eliminate unnecessary dredging activities in the Bay and Oakland Estuary; (2) to conduct dredged material disposal in the most environmentally sound manner; (3) to maximize beneficial use of dredged material as a resource; and (4) to develop a coordinated and cooperative permitting framework for dredging operations and dredged material disposal in the Bay.

The LTMS set a long term goal that no more than 20% of dredged sediment would be disposed in the Bay, no more than 40% in the ocean, and not less than 40% would be applied to beneficial reuse. These goals were largely met during the first twelve years of the program, according to a report by the agencies in 2013, and the report recommended they continue to be followed.

In 2015 the Corps and the Regional Board published a Final Environmental Assessment/Environmental Impact Report on the Corps' plans for maintenance dredging between 2015 and 2024. Because of concerns about the Delta smelt (a federally-listed endangered fish) and the Longfin smelt (a California-listed threatened fish), the EA/EIR included two "Reduced Hydraulic Dredge Alternatives," which would require the Corps to

use clamshell dredges rather than hopper dredges in certain channels, while still annually dredging. Under Reduced Hydraulic Dredge Alternative 1, starting in fiscal year 2017, the Corps could use a hydraulic dredge only in the main shipping channel and either the Richmond Outer Harbor or the Pinole Shoal Channel; the Corps would purchase mitigation credits for the take of imperiled fish in the hydraulically dredged channel and would use a mechanical dredge in the other channel.

Under Reduced Hydraulic Dredge Alternative 2 starting in fiscal year 2017, the Corps could use a hydraulic dredge only in the main shipping channel. The Regional Board found that the Corps could feasibly implement either alternative, as each provided a two-year phase-in period to allow the Corps to budget for the change in equipment use.

The decisions at issue in this lawsuit arose out of a consistency determination ("the CD") the Corps issued in the spring of 2015 regarding its dredging plans for 2015-2017. While the CD identified a number of existing and future beneficial reuse sites, it designated only in-Bay disposal sites and the San Francisco Deep Ocean Disposal Site as the Federal Standard placement sites. The CD proposed to dispose up to 48% of the dredged sediment in the Bay and up to 55% in the ocean, and did not commit to beneficial reuse of any dredged sediment. The CD also did not commit to use clamshell dredges in any navigation channel.

In June of 2015, BCDC issued a conditional concurrence with the CD, in the form of a proposed Letter of Agreement ("LOA"). The conditions imposed by BCDC included:

> 1) Beginning in 2017, the Corps must comply with, inter alia, Bay Plan Dredging Policies 1 and 5 to maximize the beneficial reuse of dredged sediment as a resource by meeting the LTMS goals that a minimum of 40% of the dredged material be beneficially reused and that a maximum of 20% of dredged material be disposed of in the Bay (the "Beneficial Reuse Condition");
>
> 2) Beginning in federal fiscal year 2017, the Corps must use a

> maximum of one hydraulic dredge in either the Richmond Outer Harbor or Pinole Shoal Channel in order to protect Delta smelt and longfin smelt and their habitat ("the Reduced Hydraulic Dredge Condition");
>
> 3) . . . the Corps must develop and implement a strategy to obtain additional funds to implement the Beneficial Reuse and Reduced Hydraulic Dredge Conditions . . . .

The Regional Board also signed off on a Water Quality Certification for the Corps' plans, with a condition. "Provision 10" of the certification required the Corps to implement either of the two Reduced Hydraulic Dredge Alternatives from the EA/EIR.

Plaintiffs argue that Lt. Colonel Morrow, Commander for the Corps' San Francisco District, had previously expressed general support for the staff recommendation that BCDC ultimately adopted. BCDC contends Lt. Colonel Morrow stated a commitment to "working through the process" with BCDC by seeking additional funding, if necessary, to satisfy the conditions BCDC sought to impose. The Corp insists that it was plainly expressing its reservations about the conditions all along, and that the state agencies understood that. On June 23, 2015, Lt. Colonel Morrow signed the LOA on behalf of the Corps.

## V. The Challenged actions

### A. November 10, 2015 letter to BCDC

In a letter dated November 10, 2015, the Corps rescinded its agreement to the LOA and objected to the conditions BCDC was imposing, stating they "exceed the constraints established by the federal standard." The Corps argued that because it allegedly would cost more to comply with the conditions, it is legally prohibited from doing so, under its own regulations requiring it to adopt the "least costly" alternative. The Corps further asserted it is not authorized to seek "special funding" for state conditions that merely implement "a state's own local preference" and that it would only comply with the conditions if the State

or another entity covered the additional cost.

B. November 10, 2015 letter to the Regional Board

In a similar letter of the same date, the Corps informed the Regional Board it could not legally comply with Provision 10, and stating if that condition were not removed, it would have to defer dredging.

C. January 2017 adoption of "Course of Action #2"

The parties communicated further in early 2016, but remained at an impasse. The Corps then took under consideration four possible courses of action (COAs):

COA #1: Status quo dredging and placement.
COA #2: Dredge in accordance with the Water Quality Certification including Provision 10.
COA #3: Dredge in accordance with the Water Quality Certification and the LOA.
COA #4: Defer all maintenance dredging of San Francisco Bay Channels.

The Corps ultimately concluded in January of 2017 that it would adopt COA #2. Under COA #2, the Corps will dredge the Richmond Outer Harbor and the Pinole Shoal Channels in alternating years, using a hydraulic hopper dredge.

VI. DISCUSSION

A. Final action

To be reviewable under the APA, a challenged decision or act must constitute "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The familiar two-prong test of *Bennett v. Spear*, 520 U.S. 154 (1997) provides that to be "final," the action (1) "must mark the 'consummation' of the agency's decision-making

process" and not be "merely tentative or interlocutory," and (2) "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id*. at 178 (citations omitted).

BCDC insists the November 2015 letters meet this test because, the Corps had "definitively determined that the State Conditions 'exceed the constraints established by the federal standard' because they were not the 'least costly, environmentally acceptable' alternative." BCDC points out that in subsequent correspondence, the Corps never wavered from the position that it lacked any discretion to comply with the conditions.

The Corps, in turn, contends the ongoing negotiations after November 2015 shows that BCDC itself did not then believe that the Corps had made any "final" decision. The Corps also argues the letters merely set out what its view of the law was, and therefore fails the second *Bennet* prong because they do not impose any legal obligations, deny a right, or fix a legal relationship.

Although the question is close, the November 2015 letters do not represent final agency action subject to APA review. If that conclusion is erroneous, however, it would not alter the outcome, because BCDC has acknowledged that,

> [e]ven if the Court were to determine that the [November 2015 letters] are not final agency actions, all of the claims and issues alleged in Plaintiffs' complaints also are implicated by COA #2, because that decision applies the Corps' final legal position as articulated in the [November 2015 letters].

There is no dispute that the Corps' adoption of COA #2 in January 2017 is a final action subject to judicial review.[2]

---

[2] While the parties devote substantial argument to various jurisdictional issues, in the end they agree there is jurisdiction to hear plaintiffs' claims under the APA, and that those are the only claims presented in these cross-motions.

CASE NO. 16-cv-05420-RS

11

B. Validity of COA # 2

As noted above, BCDC sought to impose three basic conditions on the Corps' dredging operations in the Richmond Outer Harbor and the Pinole Shoal Channel—the Beneficial Reuse Condition, the Reduced Hydraulic Dredge Condition, and the requirement that the Corps seek additional funding. The third condition derives from, and is intertwined with, the second.

*1. Beneficial reuse*

COA # 2 does not address beneficial reuse. Although the Corps discusses at some length the efforts it has gone to in the past to support beneficial reuse, and its commitment to implement beneficial reuse whenever it is not more costly, its basic position is that the targets in the LTMS are mere policy goals, not binding enforceable state standards that have been incorporated into federal law. The Corps focuses on "Bay Plan Policy 1" which relates to limitations on in-Bay disposal. BCDC responds that "Bay Plan Policy 5" is more pertinent, as it expressly states "dredging projects should maximize the use of dredged materials as a resource." Regardless of which particular statement more directly addresses the issue, however, there has been no showing that these generalized policy statements embody requirements that may be enforced against the Corps through the regulatory framework discussed above. Accordingly, the Corps was not legally obligated to accept the Beneficial Reuse Condition.

*2. Reduced Hydraulic Dredging*

The heart of the parties' dispute lies here. As set out above, BCDC sought to impose a condition on the Corps' dredging activities that beginning in 2017, and each year thereafter, "the Corps must use a maximum of one hydraulic dredge in either the Richmond Outer Harbor or Pinole Shoal Channel." COA #2 meets the letter of that requirement, because the Corps is in fact using a hydraulic dredge in only one channel

each year.

BCDC, therefore, is left to argue that the Corps should not be permitted to use a hydraulic dredge in either of the channels each year, unless it also uses a clamshell dredge in the other channel in the same year. BCDC argues that failing to dredge both channels annually may lead to some *economic* damages if larger ships are unable to use one or both the channels, and the Corps has acknowledged that possibility. BCDC has not shown, however, how its authority under the statutory scheme to regulate the Corps' activities in light of environmental concerns would extend to compelling the Corps to address commercial interests.[3]

To support the argument that it can effectively force the Corps to perform additional dredging even where the Corps has agreed to follow the limits the state agency imposed, BCDC relies on *Ohio v. United States Army Corps of Engineers*, 259 F. Supp. 3d 732 (N.D. Ohio 2017). The *Ohio* case involved the Corps' dredging responsibilities for the Cleveland Harbor Federal Navigational Channel, which consists of three sections of water: 5.5 miles of shoreline enclosed by breakwater structures; 5.8 miles of the lower Cuyahoga River; and, one additional mile known as "the Upper Channel." *Id.* at 739. The Corps was willing to dredge all but the Upper Channel and to dispose of the sediments in a "confined disposal facility," due to the presence of toxins in the sediments. *Id.* at 741-42. The Corps, however, believed that sediment from the Upper Channel could safely be dumped in Lake Erie, which would be more economical. *Id.* When the state insisted that Upper Channel sediment also be placed in a confined disposal facility, the Corps responded that it simply would not dredge the Upper Channel at all, unless the state paid for the additional costs. *Id.*

On the parties' cross-motions for summary judgment, the *Ohio* court found that the

---

[3] BCDC does offer some speculation that failure to dredge both channels annually could lead to an increased risk of oil spills. Even if that point had been more fully developed and factually supported, it is not clear that anything in the regulatory scheme would give BCDC the ability to compel the Corps to do *more* dredging rather than less.

Corps was obligated to dredge the entire Cleveland Harbor Federal Navigational Channel, including the Upper Channel, and to dispose of the sediments in a confined disposal facility, at federal expense. *Id.* at 766-67. At first blush, *Ohio* might seem to be closely on point. The critical distinction, however, is that Corps' obligations in that case were governed, in substantial part, by 33 U.S.C. § 426o-2, which provides, in relevant part:

> Using available funds, the Secretary shall expedite the operation and maintenance, including dredging, of the navigation features of the Great Lakes and Connecting Channels for the purpose of supporting commercial navigation to authorized project depths.

Prior to the summary judgment opinion in *Ohio*, the court had entered a preliminary injunction requiring the Corps to dredge the Upper Channel. In entering the injunction, the court found:

> Congress has already approved full funding for the project *including a line item approval of the cost of the CDF disposal for all sediment recovered for the full six mile stretch*. Under the specific facts of this case, therefore, the obligation created by this statute was specifically defined by Congress through its original authorization of the dredging of this particular Channel, *and the appropriation of all funds necessary to accomplish this task to the specifications of the State's water quality certification*.

*Ohio v. U.S. Army Corps of Engineers*, 2015 WL 2341114, at *4 (N.D. Ohio May 12, 2015)(emphasis added). The eventual decision on summary judgment followed the initial rationale:

> Once the Corps exercised its discretion to prioritize the 2015 Cleveland Harbor Dredging Project *and that project was funded by Congress*, the Corps was statutorily required to use all available funds to execute the project, and was required to comply with State WQC conditions when disposing of the dredged sediment. Because the Corps *received funding to cover the full costs of that compliance, and has been directed by Congress to pay for one hundred percent of the costs* of such

CASE NO. 16-cv-05420-RS

14

> operation and maintenance projects, it unlawfully withheld and/or unreasonably delayed the dredging of the Upper Channel when it refused to dredge that channel unless it received non-federal funding to cover the cost of CDF disposal.

*Ohio* at 766–67.

Here, BCDC insists that the Corps similarly may have initially had discretion in determining what dredging projects it would or would not carry out, but once it "prioritized" annual dredging of *both* the channels, it could not abandon that goal merely to avoid additional expenses arising from the need to comply with conditions imposed by the state agencies. Unlike the circumstances in *Ohio*, however, there is no indication that Congress provided a "line item approval" of the full cost of complying with the state conditions, or otherwise provided "funding to cover the full costs of that compliance." Thus, to whatever degree the Corps could be said to have "prioritized" annual dredging of both channels by planning to do so with hydraulic dredges, the basis on which the *Ohio* court compelled additional dredging simply is not present here.

Because the Corps' plan does not violate the maximum limits on dredging imposed by the state agencies, BCDC cannot prevail in this action absent a basis to force the Corps to do more dredging than it has agreed to carry out. BCDC has not shown the Corps has any obligation that may be enforced by BCDC through the applicable regulatory scheme. Accordingly, the Corps' motion must be granted and plaintiffs' motion denied.

## VII. ADDITIONAL MOTIONS

A. Motion to supplement

The parties previously engaged in extensive motion practice before the assigned magistrate judge to settle the content of the administrative record. BCDC now moves to supplement the record further with two budget documents purportedly showing that the Corps had "prioritized" funding for annual dredging of both channels, which it contends relates to the applicability of the *Ohio* case.

The assigned magistrate judge denied plaintiffs' motion to supplement the record with these two documents and several others, because there was no evidence that the Corps considered them in reaching the decisions at issue in this case. The magistrate judge specifically stated, however, that:

> This order does not reach the issue of whether these budget documents, all of which are already in Plaintiffs' possession, can be considered as extra-record evidence under any of the exceptions set forth in *Lands Council [v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)]. The question of whether evidence is admissible, as opposed to whether it constitutes part of the administrative record, is best addressed to Judge Seeborg in the context of a motion on the merits.

The additional documents are not properly part of the administrative record for the reasons identified by the magistrate judge. Nor are they strictly admissible under any of the *Lands Council* exceptions. Even assuming they could nonetheless properly be considered, nothing in the documents compels a conclusion the Corps has a legal obligation to dredge both channels annually. Accordingly, the motion to supplement is denied.

MOTION FOR LEAVE TO FILE AMICUS BRIEF

Western States Petroleum association seeks leave to file an amicus brief. The Corps strongly objects, contending the proposed brief improperly relies on facts that are not supported by evidence, and that any such evidence would be extra-record in any event. The Corps contends that the remainder of brief consists of unhelpful argument. Western States insists it has limited its factual assertions to matters shown in the record and that it can provide a unique and useful perspective on the consequences to its industry of bi-annual dredging. The brief will be deemed filed, and has been reviewed. As reflected by the discussion above, however, nothing in the brief has altered the analysis.

## VIII. SAN FRANCISCO BAYKEEPER

As noted above, San Francisco Baykeeper, a private environmental group has intervened as an additional plaintiff. The order permitting intervention stated:

> Baykeeper has shown that it intends to pursue claims under the Clean Water Act that go beyond the claims BCDC is pursuing, or can pursue. Although there may be substantial overlap in the relief [that] Baykeeper and BCDC are respectively seeking, Baykeeper has made a sufficient showing that BCDC cannot be presumed to represent its interests adequately.

At least in these cross-motions, no direct claim under the Clean Water Act is being advanced. Rather, Baykeeper and BCDC have moved for summary judgment jointly under the APA claims, making no distinctions between themselves. Accordingly, the parties are directed to provide a statement as to their understanding as to what, if any, claims may remain for disposition following this order.

## IX. CONCLUSION

The Corps' motion for summary judgment is granted, and the motion brought jointly by BCDC and Baykeeper is denied. Within 20 days of the date of this order, the parties shall file a joint statement setting out their shared or respective positions as to what remains to be decided, if anything. In the event the parties are in agreement that this order effectively disposes of the entire action, the Corps shall instead submit a proposed judgment, approved as to form by BCDC and Baykeeper.

**IT IS SO ORDERED**.

Dated: November 4, 2019

RICHARD SEEBORG
United States District Judge

CASE NO. 16-cv-05420-RS

17